## Case No. 7,750.

KEYSER v. COE.

[9 Blatchf. 32; 6 Am. Law Rev. 366.] [1]

Circuit Court, D. Connecticut. Sept. 19, 1871.

COURTS — BOUNDARIES OF DISTRICT OF CONNECTICUT—GOOSE ISLAND—PLEA TO JURISDICTION.

1. Whether, where noxious odors generated by the defendant, in a manufactory carried on by him outside of the jurisdiction of this court, are transmitted through the air to the residence of the plaintiff situated within such jurisdiction, and there inflict injury, this court has jurisdiction to arrest the evil, the parties being properly before it, quere.

2. Under the patent of Connecticut, of March 19th, 1631, known as the Warwick patent, and the charter of Connecticut, of April 23d, 1662, granted by Charles II., and the patent of Charles II. to the Duke of York, of March 12th, 1664, upon which three documents the territorial limits and jurisdiction of the colonies of Connecticut and New York rested, the islands lying easterly of the land boundary between the two, and adjacent to the Connecticut shore, are within the jurisdiction of Connecticut. The possession of Connecticut has always been consistent with this view of the documentary title.

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission. 6 Am. Law Rev. 366, contains only a partial report.]

3. Although New York has claimed jurisdiction over three islands called Captain's Islands, lying some two miles to the westward of Goose Island, a small island lying about a mile from the shore, off Norwalk, Connecticut, yet Connecticut has never conceded such claim, and New York has never claimed jurisdiction over Goose Island. Goose Island is within the territorial limits of Connecticut.

[This was a bill in equity by John H. Keyser against Enoch Coe to enjoin a nuisance. Defendant pleads to the jurisdiction of the court.]

Asa B. Woodward and Tilton E. Doolittle, for plaintiff.
George H. Watrous and Levi Warner, Jr., for defendant.

SHIPMAN, District Judge. This is a bill in equity, to enjoin a nuisance. The plaintiff owns and occupies a residence on the shore of Long Island Sound, in the town of Norwalk, in the state of Connecticut; and the defendant owns a small island, called Goose Island, about a mile from the shore. On this island the defendant has an establishment, in which he manufactures artificial manures, from dead fish and other offensive materials, the odor of which often reaches the main land and the plaintiff's residence, and creates, as the bill alleges, an intolerable odor, exceedingly disagreeable and sickening. The plaintiff brought his bill against the defendant, to enjoin this nuisance, in the superior court of Connecticut for Fairfield county. The defendant removed the cause into this court, and filed a plea to the jurisdiction, alleging that Goose Island is not within the state of Connecticut, and, consequently, not within the limits of this judicial district, and averring that, therefore, this court is without jurisdiction. This plea the plaintiff traversed, and, the evidence on the issue of fact thus raised having been heard, Judge Woodruff delivered an oral opinion of the court, in May last, finding this fact adversely to the claim of the defendant, and overruling the plea, at the same time stating that a written opinion, fully embodying the views then expressed, would be filed at a subsequent day. We now proceed to set forth, in somewhat more detail, the views then orally presented.

The main question is, whether the subject-matter of this suit is within the jurisdiction of the court. The bill alleges, that the noxious odors complained of are transmitted through the air, from the defendant's works on the island, to the plaintiff's residence, which is in Connecticut, injuring the health, and destroying the comfort, of himself and family, and impairing the value of his property. It was suggested, on the argument, that, even if Goose Island, where the noxious odors are generated, be without the district of Connecticut, yet, as these odors are blown to the shore, and there inflict the injury complained of, this court has ample jurisdiction to arrest the evil, the parties being properly before it. This is an interesting question, but, the conclusion which we have reached on another and more comprehensive branch of the case, renders it unnecessary that we should pass upon it. We, therefore, confine ourselves to the question of fact to which the proof was addressed, and the only one which was discussed on the argument, and that is, whether Goose Island is within the limits of the state of Connecticut.

The rules of evidence applicable to controversies touching the boundaries of states, do not differ materially from those relating to the boundaries of land between individuals. In both cases, resort is made to documents and muniments of title, such as grants, charters, and deeds, and, where these fail, to evidence of use and occupation. We have, in this case, tested the question now under consideration by both of these classes of evidence.

The first piece of documentary evidence which claims our attention is the patent of Connecticut, well known, in her history, as the Warwick patent. The date of this patent was March 19th, 1631. It is stated by Trumbull, in his History of Connecticut (volume 1, p. 27), that Warwick derived his title from the council of Plymouth, by a grant made to him in 1630, and confirmed by a patent from Charles I. The council of Plymouth held under the great patent of New England, from James I., dated November 3d, 1620. Though the descriptive words of the grant in this Warwick patent of 1631 are peculiar, a careful consideration of them leaves no substantial doubt as to their true meaning, so far as they bear on the present controversy. This descriptive clause is as follows: "All that part of New England, in America, which lies and extends itself from a river there called Narraganset river, the space of forty leagues, upon a straight line, near the sea shore, towards the southwest, west and by south, or, west, as the coast lieth, towards Virginia, accounting three English miles to the league; and, also, all and singular the lands and hereditaments whatsoever, lying and being within the lands aforesaid, north and south, in latitude and breadth, and in length and longitude, of and within all the breadth aforesaid, throughout the main lands there, from the Western Ocean to the South Sea, and all lands and grounds, place and places, soil, wood and woods, grounds, havens, ports, creeks and rivers, waters, fishings, and hereditaments whatsoever, lying within said space, and every part thereof; and, also, all islands lying in America aforesaid, in the said seas, or either of them, on the western or eastern coasts or parts of said tracts of lands by these presents mentioned to be given, granted, &c." It will be noticed, that the eastern boundary of the tract here granted is not described, except by naming Narraganset river (now called Narraganset Bay,) as the line from which the belt of land included in the grant took its start. The north-

ern boundary is not described at all, but it has universally been understood to be coincident with the southern boundary of the colony of Massachusetts Bay, as fixed by the grant of the council of Plymouth to Sir Henry Roswel and others, March 19th, 1627. The western boundary of the land granted by the Warwick patent it is not necessary to determine in this controversy. It was long a subject of dispute between Connecticut and other colonies, and involved interests of great magnitude, but which do not now concern us. The words in this patent, "from the Western Ocean," refer, of course, to the Atlantic. This is clear, from the fact that the grant to Sir Henry Roswel and others, already referred to, and dated four years earlier than the Warwick patent, employs the words, "from the Atlantic and Western Sea and Ocean, on the east part, to the South Sea, on the west part." Whether the words "South Sea," in the Warwick patent, meant what is now called the Pacific Ocean, as has been generally supposed, we do not stop to enquire.

We now come to that part of the southern boundary of the Warwick grant which is germane to the question before the court. It commenced at Narraganset river or bay, on the east, and extended westerly "as the coast lieth, towards Virginia," forty leagues, or an hundred and twenty miles. The words, "upon a straight line," are not used in the instrument to designate the actual southern boundary, but merely as a line on which the distance between the two termini was to be measured, these termini being Narraganset river on the east, and a point on the coast forty leagues from that starting point. The words, "near the sea shore," must have been used in the sense of "along the sea shore." But, if we were to construe the words, "upon a straight line," literally, the boundary indicated by it would not support the defendant's plea to the jurisdiction. For, a straight line drawn from Point Judith, the starting point, to Lyon's Point, which has long been practically settled as the western terminus, would leave Goose Island on the north, and within the limits of the grant. But, as already stated, we regard the southern boundary indicated by the descriptive words of the grant to, be the coast washed by the sea. This interpretation is confirmed by other comprehensive words of the grant, by which are included in it not only all "havens, ports, creeks, waters, fishings," but, "also, all islands lying in America aforesaid, in the said seas, or either of them, on the western or eastern coasts or parts of said tracts of lands." The word, "seas," in this passage, cannot be confined to Narraganset Bay on the east and the Pacific Ocean on the west, for, the former is called only a river, in this grant. "Seas" must have included the Atlantic, of which Long Island Sound was an arm. We need not trouble ourselves now to inquire whether or not Long Island could be properly covered

by this grant, as Connecticut long and unsuccessfully contended. It is sufficient for us, that its obvious and natural import included all the small islands, including the one in question, contiguous to the north shore of the Sound.

The next document, in order of time, is the charter of Connecticut, granted by Charles II., April 23d, 1662. This instrument describes the country intended to be embraced within it, thus: "All that part of our dominions in New England, in America, bounded on the east by Narraganset river, commonly called Narraganset Bay, where the same falleth into the sea, and, on the north, by the line of the Massachusetts Plantation, and, on the south, by the sea, and, in longitude, as the line of the Massachusetts Colony, running from east to west; that is to say, from said Narraganset Bay on the east, to the South Sea on the west part, with the islands thereunto adjoining, &c." It is immaterial to our present purpose whether the "sea" here mentioned as the southern boundary meant the Atlantic Ocean outside of Long Island, or that arm of it known as Long Island Sound. It certainly meant one or the other; and, if we interpret it to mean the Sound, and thus restrict it within the narrowest limits which the language will bear, still the water is the southern boundary, while "the islands thereunto adjoining" the principal tract are expressly included and covered by the instrument. That, by the terms, "the islands thereunto adjoining," it was intended to include all those small ones scattered along the main shore, is too plain to admit of a doubt.

We now come to the patent of Charles II. to his brother, the Duke of York, dated March 12th, 1664, thirty-three years subsequent to the Warwick patent, and two years later than the charter of Charles II. to Connecticut. After granting certain portions of the "main land of New England," the instrument proceeds: "And, also, all that island or islands commonly called by the several name or names of Matowacks or Long Island, situate, lying, and being towards the west of Cape Cod and the Narrow Highgansetts, abutting upon the main land between the two rivers there called or known by the several names of Connecticut and Hudson's rivers, together, also, with said river called Hudson's river, and all the land from the west side of Connecticut to the east side of Delaware Bay, and, also, all those several islands called or known by the names of Martha's Vineyard and Nantukes, otherwise Nantucket, together with all the lands, islands, * * * harbors, * * * fishings, * * * to the said several islands, lands, and premises belonging and appertaining, with their and every of their appurtenances, &c." From this description no one would have any doubt that Long Island was included in its scope, even if its names had been wholly omitted. Its location is given, and its length approxi-

mately indicated, so as to place its identity beyond mistake. "Abutting upon the main land between the two rivers there known as Connecticut and Hudson's rivers," of course, means, off, abreast of, the main shore, between the mouths of these streams. The "islands * * belonging and appertaining" to that and the other main islands named, must refer to those contiguous to them, or in their vicinity. Of these there were a considerable number, too insignificant, in that day of large and sweeping grants and imperfect geographical knowledge, to be described, but so contiguously situated as to be naturally and aptly included in the conveyance, by general terms. They would, perhaps, pass by implication, as incidents to the main subjects with which the instrument was dealing. But we know of no rule of construction that would warrant us in extending this grant to the small islands adjacent to the shore of Connecticut, even had the patent to the Duke of York ante-dated, instead of post-dated, the Warwick patent and the charter of Connecticut.

It is well known, that; long prior to the date of the patent of the Duke of York, Connecticut had exercised jurisdiction over a large part of Long Island. We are not called upon to vindicate her claim to that jurisdiction. She regarded it as included in the Warwick patent and in the charter of Charles II. The former expressly granted "all islands lying in America aforesaid, in said seas, or either of them, on the western or eastern coasts or parts of said tracts of lands." One of "said seas," as we have already seen, was the Atlantic Ocean, and Long Island was on the coast of the eastern part of the tract of land granted. There was nothing in any prior grant which conflicted with this claim. The great patent of New England, granted by James I. to the council of Plymouth, embraced the whole region from the fortieth to the forty-eighth degrees of north latitude, "with all the seas, rivers, islands, creeks, inlets, ports, and havens within those degrees." Out of this vast tract, that described in the Warwick patent was carved; and, as the latter lay on the coast, and the instrument which described it expressly included "all islands" on the coast or parts of said tracts of lands, it is not surprising that Connecticut asserted her claim to Long Island, or, at least, to that part of it which lay abreast of her shore—a claim recognized by the Dutch, in 1650, in the treaty of Hartford, which gave Connecticut all that part of the island east of a line drawn from the westernmost part of Oyster Bay to the Atlantic Ocean, a treaty which was ratified by the states general of Holland. The charter of Charles II. bounded her "south by the sea." She interpreted the word "sea" as synonymous with "ocean," and, on that ground, also, claimed to the Atlantic shore on the south side of Long Island. The grant to the Duke of York was in conflict with this claim, and the question of its

validity came before a royal commission, in November, 1664. This commission was attended by delegates from Connecticut, duly authorized by the colony, and included the governor. The instrument which contained the result of their settlement of the boundary was signed November 30th, 1664, by the royal commissioners and those from Connecticut, and, so far as it bears upon the question before us, was as follows: "We do declare and order, that the southern bounds of his majestie's colony of Connecticut is the sea, and that Long Island is to be under the government of his royal highness the Duke of York, as is so expressed by plain words in said patents respectively." This is not very explicit, except as to Long Island. It was conclusive against the claim of Connecticut to that. But it uses the word "sea" as defining her southern boundary, the same word used in the charter of 1662. The eastern portion of her southern boundary was confessedly the Atlantic Ocean, but, whether the word "sea" was used as synonymous with "sound," and as thus defining the western and greater portion of her southern boundary, does not appear very clearly. Yet the explicit recognition of the title of the Duke of York to Long Island, would impliedly exclude the idea that the southern boundary of Connecticut extended south beyond the Sound. But, however this may be, the settlement now under consideration nowhere, either by express words or by implication, recognizes the title of the Duke of York to the small islands along the Connecticut shore.

It is true, that the settlement agreed on by the commissioners fixed, also, the west bounds of Connecticut, and that, in doing this, they commenced at the point on the east side of Mamaroneck creek, where it falls into the Sound, and from that starting point ran northerly. It is true, too, that, in all the adjustments of the western boundary line between Connecticut and New York, except that contained in the treaty of Hartford, in 1650, the southern terminus or starting point of the line defined was fixed at some point on the shore of the Sound. It now stands at Lyon's Point. But, the inference which we are asked by the defendant to draw from this fact, is not warranted by the fact itself, nor by any circumstance connected with it. That inference is this—that, inasmuch as the western boundary line of Connecticut was not defined further south than the north shore of the Sound, therefore, Connecticut had no territorial rights beyond that shore, in a southerly direction. To state this proposition is to answer it. The land part of the boundary on the west of Connecticut was the only portion that caused any trouble between her and New York. To define that, down to the waters of the Sound, was all that was necessary. The water was an arm of the sea, over which neither colony could have any exclusive control. It was a highway common to both, and open to the commerce of all who were at

peace with England. To define the boundary line on the land to the water's edge, was all that was required, leaving the jurisdiction over the adjacent waters and islands to be determined by the respective patents or charters of the two colonies, and the law of nations. The claim, therefore, that the omission to define the line on the water, left the islands near the Connecticut shore and east of Mamaroneck creek under the jurisdiction of the Duke of York, is not even plausible. Just as well might it be claimed that the islands west of that creek were left within the jurisdiction of Connecticut. These remarks apply to all that part of the evidence which relates to the west boundary of Connecticut. This boundary, for many years, fluctuated east and west, and finally was settled, so far as the southern terminus was concerned, at Lyon's Point, where it now remains. This disposes of the objections of the defendant to the jurisdiction of this court, so far as those objections are founded upon documentary evidence. Our conclusion is, that, upon any just construction of the three great muniments of title which we have considered, and upon which the territorial limits and jurisdiction of the colonies of Connecticut and New York rested, the islands lying easterly of the land boundary between the two, and adjacent to the Connecticut shore, are within the jurisdiction of the latter state.

The possession of Connecticut has always been consistent with this view of the documentary title. So far as these islands have been permanently occupied at all, that occupancy has been by citizens of this state, who have recognized its jurisdiction over their island possessions. In conveyances, the land of which they are composed has been described as lying within the state, and the deeds thereof, offered in evidence, have been recorded in the appropriate land records within the same jurisdiction. The defendant holds his title under a long line of conveyances describing the island in question as situated in Connecticut.

To this uniform possession of Connecticut, New York has made no adverse claim, so far as we are apprised, except in a single instance, to which we will now refer. On the 12th of February, 1765, Cadwallader Colden, then lieutenant-governor of New York, addressed the following letter to Governor Fitch, of Connecticut:

"New York, February 12, 1765. Sir: Having laid before his majesty's council the inclosed petition of John Anderson, holder of, by grant under the great seal of this province, three islands in the Sound, and complaining that he has lately been sued by Justus Bush, David Bush, William Bush, and John Gregg, inhabitants of the colony of Connecticut, for a supposed trespass on one of those islands called Captain's Islands, and praying the interposition of this government, in order to secure to him the effect of the royal bounty, I am, by the advice of the council, to propose to your government the submitting the matter of jurisdiction with respect to these islands, and such others in the Sound as are or may be contested, to the determination of his majesty in his privy council, on such state of the controversy as each government shall think fit to transmit to his majesty's ministers for this purpose, and that, in the mean time, all judicial proceedings be suspended, as ineffectual, and necessarily leading to great animosities between individuals, and to embroil the two governments. As the matter proposed will answer the same end as a commission in the usual form, and, being attended with little expense, seems better adapted to a case in which the public interest in either colony is inconsiderable, I flatter myself that it will meet with the approbation of yours, in which case I shall order the proper papers to be prepared, and shall transmit them without delay. I am, with great regard, sir, your most obedient, humble servant, Cadwallader Colden.

"The Honorable Thomas Fitch, Esq., Governor of Connecticut."

This letter was received by Governor Fitch on the 18th of February, 1765, and, on the 22d, he replied as follows:

"Norwalk, 22d February, 1765. Sir: On the 18th I received your letter of the 12th, acquainting me that John Anderson had exhibited his petition to you, complaining he has lately been sued by some of the inhabitants of this colony, for a trespass on one of the islands called Captain's Islands, and praying the interposition of your government in order to secure to him the effect of the royal bounty in granting him those islands under your province seal. His petition you mention was not inclosed; the purport, therefore, I collect from your letter. The proposal you are pleased to make this government, of submitting the matter of jurisdiction with respect to those three islands, and such others as are or may be contested, to the determination of his majesty in his privy council, I shall lay before the general assembly of this colony, as soon as opportunity presents, which will be in May, unless, on some special occasion, it may be found necessary to meet sooner. I must observe, a proposal to this government to submit a matter of jurisdiction which it has exercised without controversy or interruption for more than one hundred years, founded, as we, at least, suppose, on good and legal authority, was unexpected; and that, after New York and Connecticut had settled the lines of government with so great precision and certainty, and Connecticut had made such great condescensions therein, I hoped that they would have had no occasion to enter into further contests on that head. However, I shall refer the whole to the assembly, who alone can properly determine the matter. I am, sir, with

great regard, your most obedient, and most humble servant, Thos. Fitch.

"The Honorable Lieut.-Governor Colden."

Governor Fitch, in pursuance of his promise to Governor Colden, did submit the letter of the latter to the general assembly, in May following, together with Anderson's petition, which, in the meantime, had come to hand. The subject was referred to a special committee, a majority of whom were among the most eminent citizens and lawyers of the state. On the 28th of May, 1765, the committee made their report, which, after stating that the government had not interfered in the suit against Anderson, but had left the matter originally in dispute entirely with the courts of law, as it was a matter relating to private property, and that, even so far as the question of jurisdiction was concerned, it was too inconsiderable to engage the attention of the two governments, in the expensive mode of settlement proposed, concludes as follows: "And further, that the lines and boundaries between the two colonies have been so effectually and finally settled, by solemn agreements, ratified and confirmed by his majesty's predecessors, that there appears no reasonable foundation for further controversy relative thereto." This report was accepted, and Governor Fitch was instructed to communicate the result to the governor of New York. In the meantime, the suit against Anderson had proceeded to final judgment, the jury having found, under a plea to the jurisdiction, that the islands claimed by him were within the colony of Connecticut, instead of New York.

The petition of Anderson to Lieutenant-Governor Colden, which referred to this suit, and led to the correspondence and legislative action already stated, deserves attention in this place; for, although Goose Island lies some ten miles to the eastward of the islands claimed by Anderson, yet the grounds of his claim that the latter were within the limits of New York, were broad enough to include all the islands, as well as a narrow strip of the main land, along the Connecticut shore, west of Fisher's Island. This petition, after reciting a grant of the three islands from his majesty, under the great seal of the province of New York, and the interference with his alleged rights by the suit in the Connecticut court, set forth the descriptive clause of the charter of Charles II. to Connecticut, which we have already referred to in another place: "All that part of our dominions in New England, in America, bounded on the east by Narraganset river, commonly called Narraganset Bay, where the said river falleth into the sea, and, on the north, by the line of Massachusetts Plantation, and, on the south, by the sea, and, in longitude, as the line of Massachusetts Colony, running from east to west, that is to say, from the said Narraganset Bay on the east, to the South Sea on the west, with the islands thereunto adjoining."

The petition then averred, that, "pursuant to this description, he is advised, that the corporation of Connecticut could justly claim no other lands than such as were comprehended between the south bounds of Massachusetts Bay, (colony or plantation,) and a line parallel thereto, running west; which, it is supposed, will be in coincidence with the sea-side for several miles westward of Point Judith, near the mouth of Narraganset Bay, until the shore bends more southerly than the parallel with the northern boundary, and such islands, (if any islands not included in those limits can be supposed to pass by the insensible, or, at least, inaccurate, epithet, "adjoining,") as are in Narraganset Bay, or in the sea, as far as it coincides with the southernmost parallel, in its western course; for, by this construction, all the words of the patent are fully satisfied, and every other interpretation will be found extravagant and injurious to the crown, and imply so gross a want of knowledge of the country as cannot reasonably be supposed even at that early day. And thus, as the south parallel or boundary of Connecticut, running west, departs from the sea-side near Fisher's Island, and crosses the country, the course of the Sound being, from about Fisher's Island, south westerly, it follows, that the title to the greatest part of the land contiguous to the northern shore of the Sound, and all the islands near it, remained (the grant to Connecticut notwithstanding) in the crown; and, those islands not being affected by any subsequent settlement, his majesty had good right to pass to your petitioner the grant above mentioned." This petition of Anderson was evidently drawn by a lawyer, and no doubt foreshadowed the legal ground upon which the province of New York rested her title, at that time, to the islands then in controversy. We do not need to discuss, at this late day, the claim then put forth by Anderson, under New York. The Warwick patent of 1631, the charter of 1662, the settlement of 1664, and the possession of Connecticut under all three, had, for more than a century, ignored any such claim, and fixed her boundary on the sea or Sound. We are aware that the state of New York adhered to the claim set up by the provincial government to the three Captain's Islands. On what precise grounds she did so we are not advised, but we infer that they certainly were not those set up by Anderson in his petition, in 1765. But the claim of that state has never extended, so far as any evidence before us indicates, to Goose Island, or any others on that part of the coast, except the three which were granted to Anderson. Connecticut has never conceded the claim of New York to those. The right of New York has never been deemed settled, and the commissioners of that state, appointed in 1856 to ascertain the boundary between it and Connecticut, stated, in their report to the legislature of New York, that

they "learned, that, in addition to the boundary question, there is a controversy respecting the jurisdiction over Captain's Island, lying in the Sound, near Byram river. As the extent of our powers." say the commissioners, "in respect to this matter, was quite uncertain, we entered into no negotiations regarding it, and made no investigations, except, incidentally, into the origin and extent of the dispute. We are, however, satisfied, that some decision of the question is urgently required." This "controversy," as the commissioners call it, doubtless led the United States to obtain from both states a cession of jurisdiction over three acres of this island, on which a light house was erected by that government, about the year 1830. So far as the evidence before us shows, the United States have uniformly taken deeds of cession from Connecticut only, of all the other islands north of the middle of the Sound and between Lyon's Point and Fisher's Island, which have been used as light stations.

We are, of course, well aware, that Fisher's Island, though lying somewhat near the Connecticut shore, and near her present eastern boundary, has long been under the jurisdiction of New York. With regard to the foundation of the title of the latter state to that island, we make no observations, as there is no evidence before us relating specially to the subject, nor is it at all necessary to the proper determination of the present controversy.

An examination of the statute of New York defining the boundaries of that state, and the discussion by her courts relating to its construction, discloses nothing which in any manner countenances the claim set up by the defendant in his plea. Goose Island is not only not included in the descriptive words of the New York boundary act, but no construction of that act has ever been suggested which would include it within the limits of that state. The language of that part of the act relating to this subject is as follows, starting from Sandy Hook: "and then to the place of beginning," (Lyon's Point), "in such manner as to include Staten Island, and the islands of meadow on the west side thereof, Shooter's Island, Long Island, the Isle of Wight, now called Gardiner's Island, Fisher's Island, Shelter Island, Plum Island, Robin's Island, Ram Island, the Gull Islands, and all the islands and waters in the bay of New York, and within the bounds above described." 1 Rev. St. N. Y. p. 65. This is somewhat obscure, as neither courses nor distances are given, but the line, however run, is to include certain islands and waters.

The construction of this clause of the act was discussed in the case of Manley v. People, 3 Seld. [7 N. Y.] 295. The plaintiff in error in that case had been indicted and convicted of theft. The indictment alleged the offence to have been committed in the county of New York. The proof showed that it was, in fact, committed on board of a steamboat on Long Island Sound, opposite the county of Suffolk, near the shore of Long Island, between Sands' Point and Huntington. The accused took the ground, in the court below, that the proof showed that the offence was committed out of the boundaries of the state, and, if not, then out of the limits of the county of New York, and within those of Suffolk county. A majority of the court of appeals held that the locus in quo was in Suffolk county, and not in the county of New York. But they did not attempt to define the boundary of the state from Sandy Hook to Lyon's Point. Welles, J., however, in his opinion, suggested two modes of defining the line indicated by the words of the statute, one of which he thought should be adopted: "The first is, to start from Sandy Hook, and run the line, by straight courses, so as to include the islands mentioned, making, with a direct straight line from Sandy Hook to Lyon's Point, an irregular figure, the exterior of which shall consist wholly of straight lines, with angles of unequal quantities, and with the vertex of each angle pointing outward from the interior of the figure. This would run the northern line of the figure or tract from some point on Fisher's Island to Lyon's Point in a direct course. * * * The second is to run the line directly from Sandy Hook to the place of beginning, in the mouth of Byram River," (Lyon's Point,) "diverging from a direct course so far, and so far only, as is necessary to include the islands, &c., mentioned, and, as soon as that object is attained, to return to the original straight direction. By this mode, it is intended to include the whole of the Sound lying east of the first mentioned direct line from Sandy Hook to Lyon's Point, and, consequently, the place where the offence was committed. I am inclined to adopt the latter of these modes." The learned judge then states his reasons for that preference, which it is not necessary for us to cite here. By an examination of the map of the territory and Sound, in connection with the statute and the opinion just cited, it will be seen, that a straight line from Fisher's Island to Lyon's Point is the furthest northern limit assigned to the boundary of New York in the Sound, upon any construction of her own statute. The line would leave Goose Island within the state of Connecticut.

In the case of Mahler v. Norwich & N. Y. Transp. Co., 35 N. Y. 352, the same subject is discussed by Porter, J. That case arose out of a collision between vessels in the Sound, between the shores of New York, and west of the Connecticut boundary. But the discussion in that case sheds no light on the question now before us, and lends no support to the claim set up by the defendant here, that Goose Island is within the limits of New York. In both of the cases which we have cited, as well as in that of The Elizabeth [Case No. 4,352], the question was, what

waters of Long Island Sound were included within the territorial limits of New York, and, therefore, subject to her exclusive civil and criminal jurisdiction. The title to no islands was in dispute, though, in tracing the boundary of the state over the waters of the Sound, of course, the islands would be included or excluded, as the case might be. But, as we have already seen, no line was suggested which would include Goose Island within the territory of New York.

It will be noticed, that the statute of New York, in describing the boundary line, includes within it not only Long Island, but also, "the Isle of Wight, now called Gardiner's Island, Fisher's Island, Shelter Island, Plum Island, Robin's Island, Ram Island, the Gull Islands," &c. Some confusion has, at times, arisen out of the fact that Ram Island was thus included in that act, as it was, also, in the act fixing the limits of Suffolk county. 3 Rev. St. N. Y. p. 2. Now, there are three islands known by the name of "Ram Island," one in Gardiner's Bay, a little south of Gardiner's Island, one just at the mouth of Mystic river, between Fisher's Island and the Connecticut shore, sometimes called Mystic Island, and a third opposite the town of Norwalk, and a little to the westward of Goose Island. It is obvious, that the Ram Island referred to in the New York statutes, is the one in Gardiner's Bay. Both acts name this island in immediate connection with others in the vicinity of the east end of Long Island. It cannot be said that some other Ram Island, than that in Gardiner's Bay, was meant. because that is located within waters confessedly within the limits of the state of New York and of Suffolk county; for, Shelter Island and Robin's Island are both named, and are both still more landlocked than Ram Island. Robin's Island is in Great Peconic Bay, a sheet of water almost entirely enclosed by the main land of Long Island. We conclude, therefore, that the Ram Island mentioned in the statutes referred to is the one in Gardiner's Bay, instead of either the one at the mouth of Mystic river, or that off Norwalk, both of which are very near the Connecticut shore. This point is not very material, but we have alluded to it to correct an error which has sometimes arisen by confounding the Ram Island in Gardiner's Bay with one or the other of the two of the same name which lie far distant, and north of any boundary line ever claimed by New York since she became a state.

From these views, it will be seen, that the fact set up by the defendant in his plea to the jurisdiction of this court is unsupported by proof of any kind, and this plea, therefore, fails, and must be overruled. Goose Island, where the alleged nuisance has been created by the defendant, is within the territorial limits of the state of Connecticut, and, therefore, within this judicial district and the jurisdiction of this court.