HENRY C. ROWE *vs.* WILLIS M. SMITH AND ANOTHER.*

The southern boundary of the territorial proprietorship of towns touching Long Island Sound follows high water mark, crossing bays and harbors upon a straight line drawn between points upon opposite shores from one of which objects and movements can be discerned with the naked eye upon the other.
The State owns the shell and floating fisheries outside of this line.
The first section of the statute with regard to shell fisheries (Gen. Statutes, tit. 16, ch. 4, part 1, art. 1,) which speaks of a certain line between the navigable waters of one town and those of another as running "southerly" from a certain point in the divisional line upon the main land, must be taken to mean a line running *due south*.
The second section of the same statute authorizes a committee appointed by any town for the purpose to designate suitable places "in the navigable waters in such town" for planting or cultivating oysters. Held that the divisional lines between the navigable waters of one town and those of another were meridional lines extending south from the termini of the lines separating the territorial proprietorship of the towns.
A statute enacted for the purpose of authorizing the designation of oyster beds by town committees, stated that a straight line drawn in a certain direction from a certain point would strike a point where the navigable waters of two

* This case was argued at a former term, but was not decided in season to be reported in its place. It was heard by the same judges that held the present term.

towns named would meet. Held that this declaration was not to be regarded as an enactment fixing the point as in the divisional line of the towns, and that as mere declaration it was without effect.

TRESPASS for entering upon grounds in the possession of the plaintiff as an oyster bed and taking and carrying away oysters; brought originally before a justice of the peace and, by the defendant's appeal, to the Court of Common Pleas of New Haven County, and in that court tried to the jury before *Cowell, J.* Verdict for the plaintiff and motion for a new trial by the defendants. It will be difficult to make the facts of the case clearly understood without a map, but it is believed that the principles of law decided by the court will be readily understood from such a statement of the facts as is given in the opinion.

*W. C. Robinson* and *R. S. Pickett,* in support of the motion.

*J. W. Alling,* contra.

PARDEE, J. In 1875 the town of New Haven by virtue of Gen. Statutes, page 214, section two, had power to appoint a committee which could designate suitable places for planting or cultivating oysters in the navigable waters within the limits of the town. At the same time the selectmen of the town of East Haven had exclusive authority to designate for the like use the navigable waters included within a boundary line commencing upon the line of division in East Haven River between East Haven and Branford, opposite low water mark, and extending thence southerly along the line of division between the navigable waters of East Haven and Branford, to the intersection of a line so drawn as to cross the centers of Stony Island and Southwest Ledge; thence westerly along the last mentioned line to Southwest Ledge; thence northwesterly by a direct line to the line of division between the navigable waters of East Haven and Orange; thence northerly along the last mentioned line of division to a point west of the southerly limit of Morris Cove; thence easterly by the shortest line to low water mark.

The plaintiff claimed title to the *locus in quo* from a designation from the selectmen of East Haven, dated June 12th, 1875, to E. G. Bates and others, and by them transferred to him.

In 1877 the legislature passed the following special resolution:—"Resolved by this Assembly, that that part of the boundary line between the towns of New Haven and East Haven which lies south of a line drawn due west from the south-west corner of the fortification on the east side of New Haven harbor, called Fort Hale, shall be and remain as follows:—a straight line commencing at a point four hundred and thirty yards due west from the western extremity of the shore at low water mark, west of the south-west corner of the fortification aforesaid and running southwesterly through, and three-fourths of a mile below, a point two hundred and thirty yards due west of the westerly extremity of Southwest Ledge, as shown upon the map of New Haven harbor made by the United States Coast Survey, and published in 1872. Nothing herein contained shall operate to affect in any manner any question of boundaries between the towns of New Haven and Orange." Private Acts of 1877, page 107.

The plaintiff also claimed title from a designation dated June 22d, 1877, by the selectmen of East Haven, acting under this resolution and under a public act passed in 1877, (Session Laws of 1877, p. 200, ch. 95,) to George A. Cook and others, and by them transferred to him.

The defendants claimed title to it from a designation made on August 25th, 1875, by the committee of New Haven, to Sidney F. Smith and others, and by them transferred to the defendants.

By the charter of 1662 Charles II. granted lands to the corporate freemen of the colony of Connecticut. With these lands, under the name of "royalties," went the royal title to the shores of the sea. The grant in 1685 from the General Assembly to the proprietors of New Haven was in effect of land bounded upon the shore; it did not undertake to convey the title of the colony to the shores of the sea. Therefore, so far forth as territorial proprietorship is concerned, New

Haven terminated at high water mark, between Stony River on the east and Oyster River on the west, following the indentations of the coast, crossing the bay or harbor upon a line drawn between the points upon opposite shores, from one of which objects and actions can be discerned by the naked eye upon the other. At the revolution the title to the shores of the sea passed from the corporate freemen of the colony to the people of the state, and in them remains the proprietorship of fisheries, shell and floating, in its navigable waters. Towns have no ownership in or control over them. The legislature alone can create an individual proprietorship in them. This it can do directly, or through a committee, general or special, or by any other method satisfactory to itself.

The state enforces public and private justice over territory below high water mark by service of process there through the instrumentality of the town at whose front such service may become necessary, except in cases of special provision to the contrary. For this purpose lines called lines of division between towns and counties are considered as extending through navigable waters, being meridional lines drawn from the termini of lines separating territorial proprietorship in towns to the line between Connecticut and New York in Long Island Sound.

In the act cited and in others referring to the allotment of territory to individuals for oyster planting, the legislature, while recognizing the existence of boundary lines between towns in waters outside of territorial proprietorship, and making such lines of separation between private proprietorship existing by its grant, has omitted to locate them by fixed monuments. The line between East Haven and Branford is described as extending from a point at low water mark "southerly;" the line between East Haven and Orange as running "northerly." We are not to presume that the legislature intended to have any element of uncertainty as to their course, but that it used these words as having a precise signification by reason of the rule of law which makes boundary lines thus described, there being no word or monu-

ment deflecting them, due north and south lines.  Thus, in *Brandt ex dem. Walton* v. *Ogden,* 1 Johns. R., 156, it was determined that "the term *northerly* in a grant, where there is no object to direct its inclination to the east or to the west, must be construed to mean *north,* and there being no object to control, it must be a *due north line.*"  See also *Jackson ex dem. Woodworth* v. *Lindsay,* 3 Johns. R., 86, and *Jackson ex dem. Clark* v. *Reeves,* 3 Caines R., 293.

And as it is a matter of common knowledge that since the passage of these acts the agents of the state making grants upon valuable consideration, and individuals taking them, have recognized this rule, we find no occasion for substituting another.

And we believe that prior to the passage of these acts this rule of a meridional line had been recognized whenever there had been occasion therefor in the administration of public and private justice.  Moreover, as the shore line of this state may be said to be practically east and west in its general course, the meridional line alone gives to each town its due proportion of navigable waters; it alone can be extended without intersection and consequent confusion.

In 1785 East Haven was carved from New Haven and incorporated as a town; it borders upon Branford eastwardly, upon the Sound southwardly, and upon the bay and harbor of New Haven and East River westwardly.  In 1803 the legislature defined the separating line of territorial proprietorship between New Haven and East Haven as passing from the mouth of East River along the middle of the channel of the bay or harbor to an intersection with the line drawn from the shore of one town to that of the other, between points from one of which objects and actions can be seen by the naked eye from the other, which point of intersection as it existed in 1803 is to be fixed by the jury.  From that point to the southern boundary of the state the western limit to navigable waters over which the state thereafter administered public and private justice through the instrumentality of East Haven, and consequently the western limit to the navigable waters of that town within the meaning of the statute

permitting an allotment of ground to individuals for the cultivation of oysters, is a meridional line.

We are not permitted to avoid the determination of the question as to the course of the lines separating what are denominated the navigable waters of the towns by accepting the suggestion that the act encouraging the planting or culti-vation of oysters is to be confined in its operation to waters within lines of territorial proprietorship; that is, to waters within lines drawn from point to point in the respective towns, from one of which objects can be discerned by the eye upon the other. For one section speaks of the navigable waters of East Haven and Branford, which are upon a line drawn through Stony Island and Southwest Ledge. Now this line is about a mile from the nearest headland in East Haven or Branford; it is in Long Island Sound, far outside of territory the proprietorship of which was first in New Haven and then in East Haven by grant from the General Assembly. And the act in another section recognizes, for the purpose of allotment of territory, the existence of a line extending south through and beyond the line drawn through Stony Island and Southwest Ledge to an indefinite distance into Long Island Sound, as being a line which at every point through its whole extent separates navigable waters of East Haven from those of Branford. Again the navigable waters of the town of Orange are spoken of in another section as extending at least to a point south of a line drawn west from the southernmost point of Morris Cove. These furnish con-vincing evidence of legislative intent to include waters outside of territorial proprietorship, and since the enactment of this law the agents of the state have granted and taken pay for allotments outside of such line, and the purchasers have occupied them.

The statute before referred to (Gen. Statutes, p. 214, sec. 2,) authorizes any town to designate by a committee suitable places in the navigable waters thereof for the planting or cultivation of oysters. Section sixth of the same statute gives specific directions for the action of these committees, when under the power granted in the second section they

designate portions of the navigable waters between Fort Hale and Long Island Sound. Hereby the legislature which enacted the law declared that it included in the term "navigable waters in a town," waters which extend as far southwardly as Long Island Sound. It is made certain therefore, so far as the four towns of New Haven, East Haven, Branford and Orange are concerned, that in the act in question the legislature intended to and did include in the expression "navigable waters of each of those towns," waters bordering upon and within the Sound; and there is no foundation for the presumption that it intended a different meaning for other towns. Be that as it may, the specifically expressed meaning covers the *locus in quo*.

Again, the first section of the same statute restricted the power of designation by East Haven of navigable waters of the town on the south, by the east and west line through Stony Island and Southwest Ledge. The act of 1877 (Session Laws of 1877, p. 200,) removes the restriction, and the town is authorized to designate places in the "navigable waters of this state" south of that line. There can be no significance in this change of expression from the "navigable waters of the town" to the "navigable waters of the state." It is a mere accident of language; for no statute, no principle of law or rule of interpretation, creates any distinction in this respect between the waters north and those south of this arbitrary line; and we are not to presume that the legislature intended to establish one which has no foundation in law or reason. And the 21st section of the same act punishes persons taking oysters from any place designated by the committee of Branford within two miles of the shore.

The jury were instructed that the south limit of the ancient town of New Haven by the patent of 1685 was a straight line running from the mouth of Oyster River to the mouth of Stony River; that in 1875 the territory outside of that line was not included in any town; yet that the proper authorities of the towns of East Haven and New Haven then had an implied jurisdiction to designate ground for oyster purposes outside of town limits, but reasonably adjacent to

the front of such towns on the Sound, and following, outside
of such limits, the boundary line between the towns extended
below such limits.   For the purpose of determining whether
the *locus in quo* was in 1875 under the implied jurisdiction
of New Haven or that of East Haven, the court gave in
effect the following instructions to the jury as to the exten-
sion of the line separating these towns beyond the line drawn
from Oyster River to Stony River, namely—If from off Fort
Hale to the last mentioned line the dividing line is straight,
it is to be prolonged directly beyond that line; but if it is
not straight at or near its junction with the Oyster River
and Stony River line, the jury are to follow it back a reasona-
ble distance, get its general course and direction, and prolong
it in such direction below the Oyster River line.   For reasons
hereinbefore given there is error in these instructions.

The court also instructed the jury to consider the first
section of the statute "as a legislative declaration and *primâ
facie* proof that the west boundary line of East Haven comes
down the harbor so as to lie to the northwesterly of South-
west Ledge, and the jury were not at liberty to find that such
west boundary line comes down the harbor in such a way as
to be due north, or northeasterly or easterly of Southwest
Ledge, unless upon very clear and satisfactory proof to that
effect;" and secondly, that it was for the jury to locate the
territory therein described, but that "the same, with the
territory above it, belonged to East Haven, and that if the
divisional line claimed by the defendants was through this
territory the jury could not adopt and must disregard such
line; for no divisional line between two towns could run
through the territory of one of the towns."   The statute
states that a straight line drawn northwesterly from South-
west Ledge will strike a point where the navigable waters of
East Haven and Orange meet.   In effect the jury were told,
first, that the fact that the legislature made the statement is
in law *primâ facie* proof of its truth; secondly, that it is
conclusive proof.   In this there is error.   The statute was
not enacted for the purpose of changing, defining, or estab-
lishing town boundary lines; no such effect is to be given to

it by construction. The statement is therefore without the power of an enactment, and, as a declaration, is without force.

Concerning this statute the jury were further instructed "that it will be presumed that the legislature would not have given the East Haven authorities jurisdiction over grounds in Long Island Sound in front of New Haven territory, and therefore it will be presumed that the territory above said limits, from some point northwesterly of Southwest Ledge, in 1870 belonged territorially to East Haven." There is error in this. As it is within the power of the legislature to place the shell fisheries in all of its navigable waters under the control of a committee resident in any one town, the statute furnishes no basis for a presumption as to the location of town lines.

A new trial is advised.

In this opinion PARK, C. J., LOOMIS and GRANGER, Js., concurred.

CARPENTER, J., (dissenting.) I think this case should turn upon the proper construction of the statute laws of this state relating to the cultivation of oysters, and certain other statutes, grants, &c., bearing upon the question of the jurisdiction of towns over navigable waters.

The statute in force in 1875 conferred upon the selectmen of East Haven special and exclusive authority to designate for the planting and cultivation of oysters "the navigable waters included within a boundary line commencing in the line of division between East Haven and Branford, thence on said line to the intersection of a line so drawn as to cross the centers of Stony Island and Southwest Ledge, thence westerly along said last mentioned line to Southwest Ledge, thence northwesterly by a direct line to a line of division between the navigable waters of East Haven and Orange, thence northerly along said last mentioned line of division to a point west of the southerly limit of Morris Cove, thence easterly by the shortest line to low water mark, and thence

by the line of low water to the place of beginning." The concluding clause of that section confers authority upon the selectmen of Orange to designate for a like purpose any portion of the navigable waters in said town not previously designated and occupied. Gen. Statutes, p. 213, sec. 1.

The second section of the same statute reads as follows: "Any other town may appoint a committee of not more than five electors of such town, to hold office one year, and until others are chosen in their stead, which shall designate suitable places in the navigable waters in said town for planting and cultivating oysters, &c."

In 1877 the second section was repealed, and an act varying from it in some respects was enacted in its place, the waters to be affected thereby being described as "the navigable waters *in said town.*" Session Laws of 1877, p. 200. At the same time, being approved on the same day, the first section was amended by adding, after the boundaries given above, the words following:—"But the oyster ground committee of said town may designate for the same purpose any places *in the navigable waters of this state* which lie southerly of that portion of said line crossing the centers of Stony Island and Southwest Ledge, which is between the westerly boundary of Branford and the westerly boundary of the town of East Haven."

Seven days later a special act was passed, (Special Acts of 1877, p. 107,) defining the boundary lines between the towns of New Haven and East Haven as follows:—"A straight line commencing at a point four hundred and thirty yards due west from the western extremity of the shore at low water mark, west of the southwest corner of the fortification aforesaid [Fort Hale], and running southwesterly through, and three-fourths of a mile below, a point two hundred and thirty yards due west of the western extremity of Southwest Ledge, &c."

It appears from the maps in the case that the disputed premises are east of the line last described and south of the line crossing the centers of Stony Island and Southwest Ledge, so that they are included among the places assigned

to the jurisdiction of East Haven by the act of 1877 amending the first section, and are there described as *the navigable waters of this state.*"

Pursuant to that act the plaintiff acquired his title.  It is very clear that at that time the authorities of East Haven had power to designate any unappropriated territory within the limits described.  The plaintiff therefore acquired a good title unless the defendants acquired a title to the same premises by virtue of the action of the authorities of New Haven in 1875.  That brings us to the question—what jurisdiction had the authorities of New Haven over the premises in 1875 ?  Their jurisdiction, and all the jurisdiction they had, was derived from the second section of the statute quoted above, (Gen. Statutes, p. 214,) unless the claim of the defendants (which will be noticed hereafter) is good, that New Haven, by the patent of 1685, extended to the state line in the middle of the Sound.  The question then may be stated in another form—were the premises in 1875 within the limits of New Haven, or were they "in the navigable waters in said town ?"

It will be noticed that there is a distinction between the special power conferred upon the authorities of East Haven, and the general power conferred upon other towns, including New Haven.  In respect to the former the first section of the statute confers jurisdiction over the "navigable waters" within certain defined limits, not being limited to the navigable waters "in the town;" so that all the waters within those boundaries were within the jurisdiction of East Haven for oyster purposes, whether they were within the chartered limits of the town or not.  And the amendment of 1877 extending jurisdiction further into the Sound, describes the waters as the "navigable waters of the state," while the second section of the general statute and the act of 1877 amending it, give to New Haven jurisdiction only over the navigable waters in the town.

It may be that this difference is accidental, that the legislature did not intend to give to East Haven more extensive jurisdiction than is given to other towns, and that the

expression "navigable waters in the town" should be construed as embracing all the waters between the towns and the state line—thus practically covering the jurisdiction of towns for enforcing the laws. But if so it is difficult to assign a reason for making East Haven an exception, specially defining its powers and jurisdiction, and when referring to waters which are clearly in the Sound and outside the charter limits of any town, describing them as "navigable waters," and "navigable waters belonging to this state."

If the expression, "navigable waters in the town," as applied to other towns, gives jurisdiction to the state line, there is no significance in the fact that East Haven is made an exception, and no force in the difference in the language used, but both expressions mean practically the same thing. But if we distinguish between the "navigable waters belonging to this state" and "navigable waters in the town," holding the former to be without and the latter to be within the charter limits of towns, the meaning of the legislature is plain, and we give effect to its obvious intention.

It is true we may not be able to perceive why East Haven should be the object of special legislation in this respect, yet, if it is clearly so, we must give effect to it and presume that the legislature had good reasons for its action.

The question then recurs, was the disputed territory embraced within the navigable waters in New Haven prior to 1877? The defendants claim that it was, and the foundation of that claim is the one alluded to above, that New Haven by the grant or patent of 1685 extended to the state of New York. I do not think that claim can be sustained.

The patent of 1685 describes the southern boundary of New Haven as follows:—"On the sea or sound on the south, from the mouth of Oyster River to the mouth of Scotch Cap or Stony River."

The general rule of the common law locates that line as follows:—beginning at Oyster River and following the shore on the line of high water easterly and northerly until it comes to New Haven harbor, at a point nearly opposite Fort Hale, where objects and actions can be discerned on the

opposite shore, thence across this harbor to the shore near Fort Hale, thence southerly and easterly on the shore to Stony River. The learned counsel for the defendants admit that the common law rule will so locate the line, and that the General Assembly on several occasions has recognized that as the true line.

The line thus described is a long distance to the north of the premises in question; and if that is the true line and it is to determine the limits of the navigable waters in the town, it is decisive against the defendants' claim. I think the common law rule should prevail, unless there is something to relieve the case from the operation of the rule. I see nothing in the case that should have that effect. No act of the legislature, no judicial determination, or other fact, is brought to our notice, which will justify a departure from a well established rule of interpretation. On the contrary the rule has been applied, I believe, in every case where the question has been raised. In the patent granted to the town of Saybrook in 1685 the town is bounded "upon the sea on the south, and on Connecticut River on the east." In another patent granted to Saybrook in 1704 the eastern and southern boundaries are thus described:—"On the east or easterly with the great river of Connecticut, and on the south or southerly with the sea or sound." It was held that the eastern boundary of the town was the west margin of the river. *Pratt* v. *The State*, 5 Conn., 388. The validity of the rule is again recognized in *Church* v. *Meeker*, 34 Conn., 421.

In *Keyser* v. *Coe*, 37 Conn., 597, the Circuit Court of the United States applied the same rule of interpretation to the Warwick Patent, granted in 1631, and also to the charter of Connecticut, granted by Charles II. in 1662. This point therefore is too well established to be seriously controverted.

The limit of individual proprietorship is more circumscribed. That includes only the upland, in no case extending below high water mark, except in those instances where the owners of the upland have exercised the right of building wharves to deep water. On the other hand towns have exercised jurisdiction for certain purposes beyond the charter

limits.   In the case of *Pratt* v. *The State*, (supra,) it was held that, while the charter of Saybrook extended only to the margin of Connecticut River, its jurisdiction for the service of process and enforcing the laws extended to the center of the river.   In the same case and also in *Hayden* v. *Noyes*, 5 Conn., 391, it was held that the town of Lyme had jurisdiction for the same purpose to the center of the river, although its charter extended only to the east line of the channel.   I suppose it also to be true that all the towns bordering on the coast have exercised similar jurisdiction over the shore and the adjacent waters.   Indeed this must necessarily be so. And perhaps that jurisdiction extends to the state line, so as to bring every portion of the state within the jurisdiction of some town for political purposes.

The question then is reduced to this—did the legislature mean by the words "navigable waters in the town" the navigable waters within the charter limits, or navigable waters within the jurisdiction for the administration of civil and criminal law?   I think the words were used in the more restricted sense.   Such is their ordinary and obvious meaning.   No one ten miles or more from the shore on the Sound off New Haven would suppose that he was in the town of New Haven in the ordinary sense of the term.   "In the town" by itself means within its territorial limits.   If it had been intended to embrace more, apt words would have been used expressive of that intent.

If used in the latter and broader sense their meaning is vague and indefinite.   The charter limits of every town can be ascertained with reasonable certainty and with comparative ease, but the boundaries of the jurisdiction outside of those limits and over navigable waters for the purpose of executing the laws have never been determined with any degree of certainty, and are not easily ascertained.   The extension of town lines into the sea is necessarily attended with considerable difficulty.   A continuation of the course of those lines at the point of intersection would in many cases cause them to cross each other, and would be attended with much confusion and uncertainty.   If they are to be extended

on meridian lines it must be done without precedent and without principle to sustain it. The legislature may do so, but it has not done so as yet. Hitherto in the history of the state we have experienced no practical difficulty in this respect in exercising jurisdiction for the purpose of enforcing the laws, but as soon as an attempt is made to divide up the waters of the Sound by town lines for the purpose of designating oyster grounds, the difficulties are not only apparent but serious. No data have as yet been given by which it can properly be done. The remedy should come from the legislature.

Again—this enlarged and implied jurisdiction is for the purpose of discharging certain duties devolving upon the state and not upon the towns. The state itself enforces its laws, and that fact is in nowise changed or modified by the fact that it does so through the agency of officials elected by the towns. They are the arms of the state for that purpose. The town as such has no privilege or duty which requires it to assume jurisdiction beyond its charter limits; so that when we say that towns exercise jurisdiction beyond those limits it is not strictly accurate; it is more correct to say that the state exercises jurisdiction through its agents appointed town-wise. The town as such has nothing to do with the service of civil process nor with the administration of criminal law. The election of officers in the several towns for those purposes is simply a convenient method of distributing those offices throughout the state; and the people in the towns electing them are acting more as a part of the sovereign power of the state than as inhabitants of the towns.

But again—this jurisdiction, such as it is, rests upon "ancient, invariable, and undisputed usage." *Pratt* v. *The State*, (supra). Now a jurisdiction acquired by usage is limited, not only in its nature and extent, but also in its object and purposes, to the usage creating it. There is no pretense that the usage had any other purpose than that of enforcing the laws. It had no reference whatever to the municipal affairs of the town.

The origin of this jurisdiction, its nature, its purposes, and the difficulty of defining its boundaries, afford a strong argument against the claim that the legislature had it in mind when it limited the jurisdiction of oyster committees to places in the town.

I think therefore that the oyster committee of the town of New Haven in the year 1875 had no jurisdiction beyond the ordinary and legal limits of the town. If so they had no jurisdiction over the premises in controversy, and their designation, under which the defendants claim title, is invalid.

It has not escaped my observation that some of the later statutes assume that town lines extend into the sea, and in some cases they expressly establish such lines. I think however that it will be found that they all have reference to the oyster business, and were enacted after it was discovered that it was desirable to cultivate oysters in deep water. It seems to me that those statutes clearly show that where the legislature intended to give towns jurisdiction over waters outside of their charter limits, they have said so. When they have not said so the inference is that they did not intend it. These statutes, therefore, instead of supporting the position of the court, seem to me to afford a pretty strong argument against it.

I am of the opinion, therefore, that the verdict was just and should not be disturbed.